Good morning, Your Honor. It's John Linehan on behalf of Mr. Amado. Hang on just a second. You waited a long time. I never want to practice immigration law. Well, you waited a long time, and if you can wait another two seconds, then we're ready. Appreciate your patience on both sides. This case has been going on in one form or another for about 12 or 13 years, so a few more minutes won't make a particular difference. Nice point. Nice point. Anyway. Okay. I think we're ready. Your Honor, if time didn't make a difference, and for a garrulous Irishman, that's a dangerous opening. But brevity is the soul of wit, so I will try and summarize this as quickly as I can. Okay. For the record, Mr. Linehan. Yes. Were you trial counsel as well? No. I did the direct appeal, and then I handled the habeas in the district court. Okay. Your Honors, essentially this case arose. It was essentially a gang shooting that was in south-central Los Angeles. Essentially the scenario was that there was a bus route that ran through the Cripps territory, and bloods were on the bus route, and the Cripps didn't like the fact that the bloods were calling people names. So this was the scenario in which the prosecution was arguing that the murder was part of a natural and probable consequences doctrine, essentially that for gang retaliation and as a result of someone being killed that this became a murder case. Mr. Amato was charged with two other people, Pugh and Johnson. The evidence against them was considerably greater. Pugh and Johnson were seen talking the night before, and there was a specific witness called Briggs, who heard them talking about why the bloods were riding through their territory and dissing people, and they were going to get on the bus, and they were going to teach them a lesson. They said it more colorfully, but that's basically what they were talking about. And they were armed, and they had guns, and it was clear that this was a foreseeable act by them. They had guns, or I think there's a question as to how many guns. Johnson had a gun. Right. There was at least a firearm at the time. So there was a firearm, and there was certainly a discussion about the use of guns. There you go. I'm concerned about the they had guns part. Okay, well, I didn't represent Pugh or Johnson, and they're in a different boat. And there was also testimony that Pugh and Johnson were members of the Crips. There was also specific testimony that Mr. Amato was not, that he was not a member of the gang. He had a brother who may have been. Anyway, there was no indication that Mr. Amato was part of this particular discussion. The next day, the bus does go through the territory, and Pugh and Johnson are seen approaching it. One does have a gun, and Mr. Amato is placed at the scene. There is a group of people that approach the bus, of which Mr. Amato is one. And as I read the testimony, it's not necessarily that this is just a group of people that are rushing the bus. This is just a crowded bus stop, and there are people approaching the bus. Pugh and Johnson get on the bus. I think Pugh is the one. How do you know Johnson gets on the bus? Well, I think you're right. I think actually Pugh gets on the bus and starts yelling and hissing. And one other person seems to have gotten on. And, well, there's testimony that there's an arm that comes through and fires the shot, and that that links to Johnson. You know, I'm worried about the evidence as to who gets on the bus. It's pretty clear that Pugh gets on the bus. Correct. We have testimony that at least one other person gets on the bus. Right. At one point, one of the shooting victims who survived briefly says three, but it seems that the weight of the evidence says that at most there were two. Correct. The identity of that second person is in question. It's almost unlikely, it seems to me, that it was Johnson, because Johnson shoots from the back of the bus, but we don't know for sure who that second person was. Right. We don't know. It's not identified as Mr. Amato. Well, interestingly, it's identified as Mr. Amato by the prosecutor in closing argument, but there's virtually no evidence that suggests that. Correct. In fact, the evidence suggests the contrary. Correct. And, well, but actually the theory of guilt, the theory of guilt as to Amato didn't really matter whether he was on the bus or not. Exactly. And it didn't make any difference whether he actually had the gun or not. And so that, well, it does make a difference if he has the gun, because whether or not it's part of the natural and probable consequences. But it does not make a difference as to whether he's actually the shooter, of which he is not claimed to be. And he did not have the murder weapon. It is never shown. In fact, they specifically said that the gun that shot and killed, well, as a result of this, unfortunately, two people were shot. Two girls are coming back from school. One is injured. One is killed. But if any of the members of the group had a gun and they all agreed that what was going to happen, it doesn't matter specifically who had the gun. Correct. And that is exactly. It is exactly within that scope of the natural and probable consequences doctrine why the testimony of one particular person, that being Hardy, Collins, Harding, whoever you want to call him, and he's called many things at various points and represented himself at various points throughout this, is critical. But essentially the evidence essentially that boils down to Mr. Amato, other than just being present at the scene, that has him joining this, comes out to the one person who is initially, he is identified at the preliminary hearing as Warren Collins. He is referred to at various points when they are talking about whether he will or will not be made available, because the DA says that he should not be made available because they are worried about him being pressured and that they're going to limit access to him. He is either Collins or Colling or Harding. The co-defendant's lawyer does attempt to identify him specifically as a potential defense witness and refers to him during that period of time as either Mr. Collins or Harding or Hardy. And then he testifies and he indicates that he told the police that his name was Collins and not Hardy at the time he was interviewed. So, counsel, we're here on habeas. And so the precise issue that we are deciding is whether or not the California Court of Appeal unreasonably applied Brady. Correct. So it would be helpful to me if you would frame your arguments in such a way as to help us resolve that issue instead of just telling us what the evidence was at trial. Okay, well, okay. I'm trying to get, I'm trying to see what, okay. The precise issue that the California Court of Appeal said that, essentially, this was not a Brady violation because there was, trial counsel did not exercise due diligence in finding this evidence and that somehow that this would have been able to find out. But the reason why, I'm trying to get to why Collins was so, Collins, Hardy, whatever, was so important. He is the one that establishes and says at the time that he sees Mr. Amato walking toward it with the group with a gun and then the next day talking with a group of people and talking about the shooting. Was he the only one who identified Mr. Amato as being with the group? No. He says there's people that say he's there, but the only person that has him actually going with a gun and then talking about it is Collins or Hardy. Were there people who identified him as being there in the group, regardless of whether he had a gun or not, with the group who had a gun? Were there people who identified him as being part of the group where someone had a gun, whether it was Johnson or Pew? Well, I mean, what they say is they see him as part of the group going toward the bus. It's not, I mean, there's some testimony about whether he went with, whether he was crossing the same street with Johnson and Pew or whether he was just walking toward the bus. But also it seems from the circumstances that there's a crowd at a bus stop. So there's people walking toward a bus. But the short answer is that there's only one witness who says that Amato had a gun. Correct. And that is Hardy. And that is Hardy. And the issue you want to talk to us about is whether the failure to deliver Brady evidence regarding Hardy makes a difference. Correct. And when I'm saying the court of appeals, and the last reason state court decision. So go ahead. Well, there were two state court decisions. Initially there was a motion for new trial, and the district, and the trial court said, I'm denying it because I don't think it's material. The court of appeals, the last reason state court decision, which is what this court would be reviewing, the state court of appeals said, no, we think it's material. But we think that you did not show due diligence, and therefore it wasn't Brady. He didn't file a declaration. Right. He, and actually what, and what happened was, and I, and later during that argument, I brought out the fact and filed a supplemental declaration by counsel. Essentially what trial counsel did was he filed a declaration by Hardy who said, I under penalty of perjury was here, and I had a prior conviction, and I was a member of the gang, and I didn't tell anybody. So that's what he actually filed. He did not say, I didn't know about it. But it was absolutely uncontested before, at the motion for new trial, that the DA did not turn it over. There was no accusation that the DA suppressed it. But there was absolutely no dispute before the trial court that there was any attempt by the, that the DA was aware of this evidence, too. But we're not reviewing that case. No. But all I'm saying is, just so I don't want to end up with perhaps a side ruling that there was a default here, is I see exactly what trial counsel did, what was required under state practice, was not to make a conclusory statement as to what Harding was going to say, or Hardy was going to say. He actually got Hardy's declaration under penalty of perjury. It was not, if he had come in and said, this is what Hardy had told me, that would have been denied. They would have said, you've got to do it. So he actually presented the record the way it should have been done. What the court of appeals said is, we don't think it's Brady, and I think that's wrong. I think that is clearly wrong. I think that is clearly against clearly established Federal rule as interpreted by Brady. And the reason is because it is impeaching evidence. It is impeaching evidence that would have dealt with a critical witness, the one critical witness, who put him there with the intent and essentially to show that he was not just joining the group to hang around or go to the bus or whatever. And certainly a trier of fact could have said that because he's there, he could be guilty. But the nature of the evidence that Hardy presented was he went there with a gun, and he specifically argued that during closing argument. He argued, specifically starting on page 1585 of the record, when Amato's lawyer said he was just there and he's not a member of the gang, and the prosecutor said, so what? It doesn't make any difference whether he's a member of the gang. He went there because he went with a gun. They were specifically given the natural and probable consequences instruction, which I think is on the record. I think at 1484, the Attorney General has relied on people versus pretty men. That is the California Supreme Court case that talks about it. I know you all know what the natural and probable consequences doctrine is, but it is a very expansive doctrine of liability. Let me interrupt. I'm trying to figure out what the court of appeal did, what the court of appeal said, and therefore what deference we need to accord to the court of appeal. The court of appeal mentions Brady only in a single sentence, and it's doing so in a section of its opinion where it's trying to figure out whether or not there was a violation of the right to a new trial, whether or not the new trial should have been granted. Right. And it's talking about whether or not there was due diligence on the part of Amado's lawyer. And it's buried in a single sentence, and the sentence says, The record before us does not establish the prosecution's failure under Brady to reveal this information to defense counsel. Accordingly, defense counsel must demonstrate the newly discovered nature of the evidence and an inability to discover. I'm not sure that we have from the court of appeal a finding that the Brady evidence or the evidence as to whether or not he was on probation, whether or not he was a blood and so on, whether or not that was material. As I read that one sentence, I find that I would tend to read that as saying the court of appeal said, I don't find an obligation under Brady to reveal it, because that's the only word that's used. Right. There's no word in that sentence as to whether or not the evidence, if revealed, would have been material. I view that as an important distinction because we clearly have to defer to the finding or holding of the last reason, decision of the court of appeal, that it was a failure under Brady to reveal. But I find nothing in that decision that says that the information, if revealed, would or would not have been material. And if there's no finding on that point, we're de novo on the materiality. Do you agree with that? Well, I agree. But I have to say that during the oral argument, I mean, I was there. Right. And the issue was it certainly appeared that the panel agreed that it was material. The panel agreed that it was material? Yes. The panel agreed that it was material. The issue was, yes, they thought given that it was, that it could have raised an issue involving the credibility of Hardy and that Hardy was a witness there. Okay. Now, that supports the notion that this sentence is confined to the notion as to whether or not there was an obligation to reveal. Right. I have to say I'm very reluctant to take a transcript of oral argument and conclude from that. Well, there isn't one either. Pardon me? There isn't one anymore. Okay. Well, even if there were one. Right. I mean, judges ask all kinds of nonsensical questions, and you've heard a few of them from me already today. I would never guess from that. But it does support the reading, if you're right on that one. I'm not going to rely on it. But the only thing I've got a holding on out of the Court of Appeal is that they say there was no obligation to reveal under Brady. Well, but the But nothing about materiality. But the first line of that paragraph says, Hardy's declaration establishes what evidence would be available and its materiality relevance to impeachment. This is, I think, a I got you. Okay. I mean, that's ER 32, and that's page 16. That suggests that it would be willing to hold that the evidence is material. I think that's so that that was their drift. So essentially what they're saying is, but So maybe we even defer to that one and say, Court of Appeal agrees that it's material. The only question is whether there was an obligation to reveal it. Right. And essentially their error was that somehow defense counsel was necessary to unearth this as opposed to the prosecution necessary to reveal it. It says the record does not establish the prosecution's failure under Brady to reveal this information to defense counsel. Well, the record shows that the prosecutor But I'm just saying this is the finding. No. Well, I know, but We can't take part of it and not all of it. Well, okay. I mean, I understand. Well, of course, I would love to slice and dice it in such a way that obviously it would be favorable to me. But it was uncontested at the hearing that the prosecution was unaware of this impeachment effort, which would be impeaching in that Hardy was a member of a rival gang and Hardy was also on probation. But we have to take what the Court of Appeal said. Right. So the Court of Appeal said the record before us does not establish the prosecution's failure under Brady to reveal this information to defense counsel. What did the Court of Appeal mean by that? Well, I think what it means is they got it wrong. I mean, I think what it means is that they didn't understand what the obligation was. I mean, it makes it look as though Can I interject? I think you're not quite answering the question. Let me answer it, and then you can say whether this is your answer. Okay. He's going to answer it for you. Okay. That's even better. I think this is what you mean, but you're sort of doing a circumnavigation. As I read it, they say, under Brady, the prosecution had no obligation to reveal this evidence because, and this goes to the next sentence, because the defendant could have found it out through the exercise of due diligence. Right. So you agree with the answer? Well, I think they could have found it out by the exercise of due diligence, and I'm saying that that's wrong in that what was necessary would have been his prior record and his gang membership. Wrong as a matter of fact or wrong as a matter of law? Well, I think actually wrong as a matter of fact at this point because, I mean But can we delve into the fact that I didn't have the state courts? The law on Brady, I think, is clear that the prosecution, to cut through this kind of discussion, is that there is certain affirmative, there's an affirmative duty by the prosecution to turn over evidence that would impeach someone who is a critical witness to their case, and this was evidence that is impeaching that would, in this case, undermine the one person who had Mr. Amato there. I'm wondering away from the question. The question is, is there a due diligence requirement? I don't think there is. I don't think there is. No. There is not a due diligence. As a matter of law, though. I think as a matter of law, there's not. What case says that what case, what Supreme Court authority, because we're on habeas, what Supreme Court authority? Kyle v. Whitley. Do you know my question? Well, I mean, I'm just saying what case law says there's no due diligence requirement? Right. Well, I think Kyle v. Whitley says that. Supreme Court? Yes. The United States Supreme Court case says what now? That the burden is on the prosecution to be diligent, and you cannot presume that the fact that the prosecutor doesn't know about it, that other agencies are doing it, and that the burden is on the government and the prosecution to present that evidence. So you're saying that the California Court of Appeals decision was contrary to? Kyle v. Whitley. Okay. Brady, as interpreted by Kyle v. Whitley. Okay. And, and, but, I mean, what the AG has argued is you, but then to say whether or not it's a harmful error, if in fact you have been given some evidence by which you would be able to piece it together, and from that, even though you aren't explicitly told, you can put it together, and that's, I mean, that's basically what Bracey held, and that's what the district court relied on. Bracey was one in which someone said, I think it was a, came in and said, I wasn't told about so-and-so's record, and lo and behold, they didn't tell him maybe exactly, but they gave him the NCIC printout, and from that, you could tell what the record was. In this case, what was happening was that, first of all, the identity and availability of Collins or Hardy was already limited. And so that part, in terms of even being able to research it and finding out what the record is. But also, the defense does not have access to criminal records the way that the prosecution has. The defense does not have access to who was a gang member as the way the prosecution has. May I ask you to point me to the precise language in Kyle's that you are contending the ---- I can't give you a precise language in Kyle's. Well, that's what we need in order to determine that the California Court of Appeals decision was contrary to Supreme Court authority. We have to know what language in Kyle's did the California Court of Appeals run afoul of. Well, I can't give you the precise language in Kyle's, but the burden is on the government, and the burden is on the prosecution to present that evidence. It is an affirmative duty by the prosecution to present basic Brady evidence. That's what Brady is. Right. But what's the language, though? When I asked you for your Supreme Court case, you said Kyle's. And Kyle's says that the suppression by the prosecution of evidence favorable to an accused upon request violates due process. Where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of prosecution. It says upon request. And that's not what we have here. Because there's no request. Well, I'm just saying, we have to, I mean, on habeas, we have to have a Supreme Court case that the California Court of Appeals ran afoul of. And this case says that suppression upon request violates due process. I'm sorry, what's the language about suppression upon request? I'm looking at pages. It's 432. It's 514 U.S. 432. I'm going to ask the Supreme Court. It's right before footnote 7. 432, okay. Yeah, right before 433. Where is it in relation to Roman 3? It's headnote 123. Do you see headnote 123? I've got Roman 3. It's kind of buried in the opinion. Yeah, it's in that paragraph. In this paragraph? The first, yeah. Under California law, it's an obligation on the part of the prosecutor to have this evidence and turn it over. No, no. I don't want to quit this yet. But in the next sentence In the next sentence in Kyle, the language is properly quoted. The next sentence in Kyle says United States v. Agers, however, it became clear that a defendant's failure to request evidence did not leave the government free of all obligation. That is to say, it's an independent, freestanding obligation to reveal. Right. Well, then it goes on to say there are three circumstances in which a Brady claim might arise. First, where previously undisclosed evidence revealed that the prosecution introduced trial testimony that it knew or should have known was perjured. Second, where the government failed to accede to a defense request for disclosure of some specific kind of exculpatory evidence. And third, where the government failed to volunteer. Exculpatory evidence never requested or requested only in a general way. So in that third one, yeah. I'm sorry. Keep going. The court found a duty on the part of the government, even in this last situation, though only when suppression of the evidence would be of sufficient significance to result in the denial of the defendant's right to a fair trial. Right. So that's what we have to show. There we go. And so under Jiglio as well, the failure to turn over impeachment evidence is classified as a Brady violation. Correct. One would expect the prosecutor to know that an important witness has a prior conviction. Correct. It's inconceivable to me that a prosecutor would not get this information. Well, and there was a request. Information about the bloods comes out in a sentencing memorandum that he might or might not have had. But the fact of having had a robbery conviction on his rap sheet, it seems to me inconceivable Well, and he was currently on probation. And he was still on probation. Correct. But, well, that there would be a current report. But also, I mean, while I don't, in going over the record, I don't. So what is the relevance of this information? Well, I think. Spell that out. The relevance was that it would give a motive as to why he would essentially finger Mr. Romano. Now, he didn't finger him. At the trial, he had no recollection. Correct. Zero recollection. That's right. So the information that comes out is, and it's not clear to me whether it's someone from the police who takes his statement. Correct. Or whether he is testifying that one of his colleagues took a statement from Hardy. Well, it is admitted ultimately and considered as substantive evidence. It is admitted as a prior statement. And because under California Evidence Code 1235, this witness was available for cross-examination. Hardy's prior statement is now admitted as substantive evidence. So where is, where is, what's the relevance now of the prior conviction? Well, the prior conviction shows that why did he give the, well, because why did he give the statement to the police at the time? If he's there and he's a member of a rival gang and he has gang involvement and he's on probation, that is a motive that he would want to say what the police wanted to say so. And so he would have said that. He may have later tried to change his mind when it comes to trial. The police did not know that he was a member of a gang. There's no evidence that the police knew that. Well, he knows he's a member of a gang and he also knows he's on probation. But why would he contact the police then? If he knows he's on probation, he knows he's a member of a gang. Well, no, he was contacted by the police as a precipient witness. Well, he made the first contact. He called the police and said there's two guys who are laughing in the backyard about the crime. Well. He's the one that instigated the police to arrest whoever they arrested. If he's a member of a rival gang, he may want to make sure that if bloods have somehow been, I mean, there's a gang motive. Why do we know that the police knew that he was a member of the rival gang? No, no, but it explains his motive why he had called. Exactly. The prosecutor can only turn over information that he knows or he should know. Why should the prosecutor have known that Hardy was a member of a rival gang? Well, they have records of rival gangs. I mean, they had a gang expert testify at trial. They had a gang expert that talked about, in fact, when they were talking about why these witnesses would be scared, this was all gang territory. They know. What was the providence? How did we know? How did we know what the prosecutor knew with regard to the rival gang? What documents shows you? Well, the prosecutor claims he didn't know. Yeah. But it turns out it existed. I'm saying under Brady he should have known. That's what Kyle says. Well, listen, here's the way I understand it is what the obligation the prosecutor has is information that the prosecutor himself does not have. Right. If a part of the government that's closely enough affiliated with the prosecutor knows it, the prosecutor can't insulate himself from Brady obligations by saying, well, I personally didn't know about it, even though part of the government knew. And as to the rap sheet and the prior criminal conviction, his very office had done the prosecution. So that's clear that the prior conviction stuff, even if the individual prosecutor didn't know about it under Brady, he's chargeable with that knowledge. What do we know in the record with respect to what part of the government, if any, knew about the gang membership of Hardy? That's the more difficult question for me. I don't know whether or not there was actually any affirmative showing that the Los Angeles or other police department knew that Hardy was a member of the rival gang. However. He was a former member or I thought a former. Well, by the time of the motion for new trial, he said he was a former member. And that was in 1999, and the shooting was in 2000, excuse me, in 96. But the prosecution presented gang experts, and they presented gang experts who are in the Los Angeles police department who were working with the case, who had interviewed people. So within that, while I can't say that the Los Angeles police department knew that Hardy was a member of a rival gang, I think there was probably a database that would have indicated gang membership and he was a member. It's probably good enough if we're trying to figure out what obligation the prosecutor had to hand something over. But even the prior record, but even, well, but the prior record, if he has a gang motive, and he has a reason for trying to finger somebody, and then when he talks to the prosecutor, he figures I'm going to give them what they want to know, and because he is on probation for a robbery, he also wants to make sure that he insulates himself because he knows he's a gang member and he doesn't want to find out anything that would involve him in a shooting, then he's going to tell them what the police want to know. Because it was clear from witnesses that Pugh and Johnson were involved. The question was how much was Mr. Amato. Mr. Amato's relevance or involvement was far more tangential. So that particular witness for that particular point would have been a critical point in why he would be someone who would want to gain favor by talking to the prosecutor in the police. So that would be impeachment evidence, right? That would be the impeachment evidence. And so his testimony was impeached. He impeached himself on the stand, didn't he? Well, but I've read so many, I mean, in gang cases and domestic violence cases, everybody gets on the stand and says nothing happened. And all of the testimony that incriminates comes out on police interviews that happened beforehand. They're admitted under 1235. And the prosecutor always argues, for whatever reason, they're scared to say what they're saying now because they're terrified. And that's their basis, and that may be true. But also, if you show he had a prior conviction for robbery and he was a member of the rival gang, there was another reason. And that was a motive why he lied. That was not because he was scared of gangs, but because he had an animus to either try and gain favor with the police or he wanted to have an animus against somebody that he thought was a rival gang member who was not involved. The issue is not why he might be lying when he's actually on the stand saying, I don't remember, because I don't remember is not evidence that inculpates Mr. Amato. The issue is what motivation might he have to lie with respect to his report to the police, which is the evidence that's inculpatory. Correct. And we're trying to figure out what impeachment evidence should have been handed over, and if it had been handed over, what use it might have served. Well, and the evidence that would have been handed over that we all seem to agree on and that they would have known about is that he had a prior robbery conviction and that he was on probation for robbery. Don't speak for me. Well, okay. I would not dare presume that I would do that. Okay. That's impeachment evidence that can attach to his credibility. That's classic. How much impeachment is generally for the jury, but the jury was denied the information. So how would the information have been given to the jury in connection with a prior police report? Well, I suppose it could have been. His rap sheet would have been introduced. Right. You would have asked him, do you have a prior record, and he would have said yes or no. Well, he's not on the witness stand. Well, but if they'd had it, he would have asked him. He could have asked on the witness stand. Right. If he'd been on the witness stand, had it been produced as Brady, he would have said, do you have it? And if he said yes, you've got it. Should we attach any significance to the fact that he was tended for an interview and the defense counsel never bothered to interview him? Well, not, I think, under an affirmative duty under Brady because you, I mean, witnesses are always tended for review. I mean, what do you ask them? What's your favorite color? I mean, I don't mean to be facetious. Do you have a criminal record? Well, you're supposed to know that. I'm supposed to know that before I talk to them. Well. What if he says no? Just in case you don't. Well, but we don't get to that. They're supposed to tell me before I talk to them, and I'm not, because I do trials, I don't want to talk to a witness until I know what their prior record is because I'll go up and talk to them and they'll say, I don't have one. So I would like to know beforehand, and that's where they're supposed to tell me before and then. Okay. But I mean, I did this case pro bono because I got so mad. Yelling doesn't make your point more powerful. Okay. I don't mean to power lecture, but this one made me so mad I did it pro bono. Well, don't be mad at us. I'm not mad at you. You don't want to be mad at us. Trust me. Not yet. Not yet. No, this is just, hey, this is fun. All right. Anyway. Well, I think it's true, I know it's true that Amato's lawyer did not interview Hardy when made available. Correct. I gather one of the co-defendant's lawyers talked to Hardy. Right, as a potential defense witness. And for some reason decided not to put him on as a defense witness. Right. Right. So it never came in the context of actually talking to him as a prosecution witness. But he was made, I mean, he was, and actually the circumstances it actually says is we think he's still available. We've made him available and we think he's still available today. That's what's actually said when they're talking about him. Whether he's actually, so actually whether he had shown up and seen him, we don't know. Okay. The sticking point for me or the hard point for me about this case is not whether there was an obligation to reveal this rap record. Right. And I think there was an obligation to reveal it in a timely fashion, which would have been before the opportunity was proffered that you were going to interview the guy. So I don't regard the lack of diligence of interviewing him as defeating the Brady obligation. Now, my colleagues may or may not agree with me on that. The harder point for me is what use it would have been to know two different things. Number one, the fact that he had been convicted and he was on probation, that seems to me clearly information that's chargeable to the prosecutor. And number two, that he had been a member of a gang and maybe had been even by the time he called the cops, which may or may not, I'm not sure on that one, had to be revealed in terms of what the prosecutor knew. So confine yourself for just a moment. How useful would it have been for the defense to say, well, isn't it true that you were on probation from a prior conviction? And isn't it true that you called, you initiated the call because you're trying to curry favor with the police and with the prosecutors in Los Angeles? I mean, that's the point, right? I mean, the question is how useful would that question and that answer have been? Right. Well, and I think the reason it would have been important is I think given his, I mean, if we had had no prior statement to the police, you're right, he would have not been a damaging witness. So what you had to do was talk about, let's talk about when you talk to the police what was your state, what was your status, and what did they know about you, and what did you know? And so they would have known that he was on probation. They would have known he had a prior robbery conviction. He might have thought that they knew he was a member of a rival gang, or maybe they did know he was a member of a rival gang, and that in talking to this he was either trying to curry favor with the police or he actually thought that Amada was involved even though he wasn't, and he may have had some animus because he thought he was a gang member, and he may have wanted to finger him, and that that's why he called them up. And then when they talked to him, he wanted to show that he was going to be on the right side of the law because he didn't want to be investigated because they might have thought that he was somehow involved because this was a gang rivalry since he was living, since he was a blood who was living in crypt territory. The only reason I'm in arguing what's always been seen at a trial when people talk about the inconsistent statements that somebody has made when they're testifying, and now you had a chance to see their credibility, but you've got to go back and see what was it like to live in that neighborhood, and you're living under fear, and there's a lot of speculations as to why they're changing their mind. And this prosecutor always gets to argue because this is a gang case, and he's terrified, and this is why he's doing it. This would have given information that would have been directly, I'm not saying it would have counteracted it, but it would have given a different scenario as to why he gave a different reason, and it would not have been that he was terrified as a gang member. He was because he wanted to curry favor with the police, and he wanted to point the finger. Did he say that in his affidavit, that he wanted to curry favor with the police? No, but he wouldn't admit that. I mean, I don't think he would, but if that evidence came in, then it would certainly be a proper argument to say that was his motive. Well, sometimes people do say that the reason that they did, yeah. Well, I mean, I wish. Okay. I mean, I'm not saying. No, I have to say. It's something that a defense counsel would certainly want to argue to the jury. Right, and I. Whether the jury believed him or not is another question. I'm not particularly being bad on Mr. Collins or Mr. Hardy. I think by the time of trial, in the motion for two trial, he had real doubts. I mean, he kind of came in and said, look, I'm going to say trier's remorse, but witness's remorse, that he wished that things had been different. And so he really had a feeling of conscience, and I have to say, probably in the gang context, he didn't want to say too much because there could have been reverse repressions. I think we. Oh, go ahead. No, I was just going to say it. My problem is we're on habeas. I mean, I understand your argument in the context of maybe even a direct appeal or a motion for a new trial. Right. But on habeas, there has to be a showing almost to the level of a constitutional deprivation of due process in order for us. I understand. It's got to be such a black or white, kind of like, you know, I mean, like on or off, yes or no, screaming yellow, kind of, you know, whatever. But I have to say that I think in viewing this and saying it wasn't Brady because somehow or other there was no obligation for the prosecutor to turn this over, that's wrong. That's the core. So the clearly established law is jignaille against the United States and the obligation to turn over impeachment evidence, that this is two aspects or three of impeachment evidence that could have changed the mix before the jury. Right. Because. This would be material in that context. Right. Because given. Right. Because given the only thing that really had him otherwise was being present. Now, one could argue that that presence showed that he was there. But the nature of this particular evidence, the coin with the gun, I mean, and it was argued. I mean, it was clearly argued in rebuttal and saying, look, you know, you're not going there with a gun for fun. You're going there because you're going there because you know what they're doing. And even though this gun wasn't going to be used, you went on with the natural and probable consequences. You knew that somebody was going to use a gun and it was foreseeable that somebody was going to get killed. And that was critical. And that came from Collins. Got it. Thank you. I hope that you feel that we gave due time to a garrulous Irishman. Don't encourage you. Good morning. May it please the court. David Wallman, Deputy Attorney General. The respondent, Terry Gonzales, the warden. Could you put the mic down just a little bit? There you go. Now I can see your face. Thanks. Okay. Briefly talking about the deference. Unfortunately, the California Court of Appeal focused most of its opinion on the motion for new trial, which is a state law issue, rather than looking very closely at the Brady issue. It did touch very briefly on Brady in that it did say that the record did not establish a failure by the prosecution to reveal the information. And that's the suppression issue, the second prong of Brady. The first prong is the favorable evidence. The second prong is the suppression. And I think basically what the state court was looking at there, although it didn't cite to the United States v. Bracey, it's basically the Bracey argument that the defense was given enough information that they could determine the Right. But I want to then piece out what you just said. I agree with everything that you said. That is to say that as I read the Court of Appeal, it says there was no obligation to reveal it. And it really is a question as to what degree of diligence might be required under Brady. And Bracey says, well, if you have enough that, you know, if the defense, if the prosecutor has given you two plus two, it's your job to add them up and make four. Okay. I got that. I think I also heard you say maybe by a negative pregnant. But I think I also heard you say that the Court of Appeal did not reach the question as to whether or not the evidence had been revealed would or would not have been material. I'm not sure if I stated that, but that is my argument that I've made in the brief. That is to say the materiality of the question was not reached by the Court of Appeal? No, it wasn't. And that's why I've tried to point the Court to the trial court. Does that, then, mean on the question of materiality that we review the materiality issue? Well, when it comes to different issues on habeas corpus, the courts have looked to different decisions of the State courts. Here you can easily divide these different prongs of Brady and look at one prong being decided by the Court of Appeal on the merits and one being decided by the trial court on the merits. I think the rule is that we look to the last reasoned decision. We don't look to the last reasoned decision and the decision before that. Or do we look to the last reasoned decision on each issue? Well, I do not have a Ninth Circuit case that supports my theory on this. I'm aware that there's a case, Baker v. Fleming, which goes the other way. Saying what? Saying that you can't look at the decisions as a collective whole, the trial court and the Court of Appeal decision. That's not in the briefs. Even if the Court of Appeal did not address an issue, so there is no reasoned decision on that issue, you can't look to a trial court decision that did address the issue? Is that what you think the case law says? Well, the case law basically says you can't combine the two levels of State court decisions. And I'm trying to distinguish this case in that there were separate prongs, separate decisions, and the Court of Appeal really didn't address the materiality. I always thought that if the last reasoned decision on an issue, not the last reasoned decision, period. So if the Supreme Court addresses some issues but does not address others, then we drop down to the California Court of Appeal for the issues that the California Supreme Court didn't address. If the California Court of Appeal didn't address the issue but the trial court did, then we drop down to the California Superior, the trial court for those issues. Maybe I'm wrong on that, but that's how I always read our case law, is that there is no decision by the, no reasoned decision by the ultimate court, then you drop down to the next court. I could be wrong on that, but that's how I thought it always was. Now, you said there's a Fleming case that's against you on this point? Barker v. Fleming. It's not in the briefs, though, Your Honor. Say again the site case. The name of the case again is? Barker v. Fleming. Barker. 423 F. 3rd, 1085. And that's one of our cases? It is Ninth Circuit. I believe it's Judge Reinhardt. How would I have guessed that? Okay. Thank you. Before you go any further, do you concede that the prosecution should have turned over a rap sheet for the witness? Yes. That's certainly a normal process in the state courts. It happens all the time. Okay. So that's a conceded Brady violation? Excuse me? Is that a conceded Brady violation by the state? Well, it's not a Brady violation because, in this case, the defense was given an opportunity to interview Mr. Hardy, and Mr. Hardy, as we can see by the fact that he filled out a declaration for Mr. Romano's counsel, was forthcoming with that information. It's technically a Brady violation, but it's excused by Bracey. Is that what you're – I mean, is that pretty much what you're saying, your argument? Plus the fact that it's not material is the second part of that argument. Yes. But the materiality question, if we can review it de novo – I'll lay off to one side for one moment, but I want to talk about the obligation to hand it over. I took you to say the prosecutor should have handed it over, meaning that's the best practice, but that you didn't say that it was obligated under Brady to hand it over in terms of what you said or what you mean to say. The question, then, is really as to whether or not this is a case like Bracey, where the prosecution said 2 plus 2 and then leaves it to the other side to add them up. The evidence here is – and we've got some talk in the actual record about this – that there are even requests, not specific to Hardy, but requests by the defense lawyers – I'm not sure whether it's by Amedow or another, but the defense lawyers – I mean, in this sense, maybe we can say they're – sometimes they act as team members and they're all being tried at the same time – to say, well, would you hand over the rap sheets? And they say, we can't get them. You guys have access to them. All you've got to do is walk down to the courthouse or use your database. We don't have them. So it would have required a court order for the defendant to get his hands on the rap sheet. Isn't that right? That normally would be the case. I do know that in this case we somehow – the defense knew about this prior conviction before even the prosecutor did. How do you know the – well, they're the ones who brought up the motion for new trial. I see. But not pretrial. No, not pretrial. But somebody told them, I guess. Nobody knew until after trial. Well, nobody knew. The prosecutor didn't know, even though the prosecutor's office had prosecuted and got the conviction. So somebody knew and somebody in the prosecutor's office knew. So I assume you're not arguing that had it been Brady material and had there been – this wasn't a Bracey case, your office had an obligation to hand it over, even though the individual prosecutor in the case didn't know about it. I'm not sure if the record's entirely clear that the prior conviction, Mr. Hardy, was in L.A. County, although the trial prosecutor does proceed under that as if that was the case and that he should have turned it over. Yes. So for our purposes, we may assume that. And I assume if it was something that was a foreign conviction, that would have been brought up at the motion for new trial level. Right. And I think it's true, then, that the prosecutor has easy access to the rap sheet, whereas the defense team has difficult access to the rap sheet. They need a court order to get their hands on a rap sheet. They've got to make some kind of a showing. I don't know what it is. Is that right? Well, certainly the normal course of business is that it comes through the prosecution. No, but I ask you a different question. Is it right that for the defense to get the rap sheet independently of it being turned over, they need a court order? That might probably be the case. It is considered confidential information under the California statutes. Right. So they can't get it simply by walking over to the database, pushing a couple of buttons. They need to know somehow that they should get it. They need to go to the court to get it. And the time frame of this case in terms of when the names are revealed between the time frame when the names are revealed and the trial starts is how long? How many days or how many weeks are we talking about? It's not entirely clear as to when Mr. Armato's counsel knew that it was Hardy rather than Collins. We do know he's referred to in the record during Hartship v. Deere as Hardy. So I guess that's the first point in the record that he's referred to as Mr. Hardy rather than Mr. Collins. But I have trouble seeing that this, that the prosecutors absolve from the obligation to turn it over when the access by the prosecutor is so easy and the access by the defense is hard and there's just a freestanding obligation to say, hey, this is what it is. I have trouble finding a lack of due diligence under Bracey. And Bracey isn't really formulated in terms of diligence. Bracey's formulated in terms of, well, we told you enough that all you had to do is you could figure it out based on what we told you. Well, prosecutors told nobody nothing. Right. This is a much harder case than Bracey. Yeah, yeah. So there's my problem with your side of the case.  Ultimately, this case may turn on materiality. And in this case, there were three eyewitnesses who identified Amato as being part of the group. Only one with a gun. Only one with a gun. And only one says he was bragging and laughing the next day. That is correct. Two of the eyewitnesses went to high school with him and knew Mr. Amato from high school. And one, Mr. Hardy, lived directly across the street from Mr. Amato. So all three eyewitnesses did know him, especially the two from high school. It's pretty clear we've got two eyewitnesses who, without any serious question, place him there. So the question is, how much did the evidence that Hardy brought, that new evidence, number one, that he had a gun, and number two, that he was laughing and bragging the next day, how important was that to the case? And then number two, how important might the impeachment have been to undermine the testimony of Mr. Hardy? That's the materiality question. When we talk about impeachment, are we talking about the gang evidence and the probation? What's your view on the gang evidence? Do you think the government should have turned that over? If the government was aware of that, yes. But is it your position that the government was unaware? It's not very clear from the record. I know they had a gang expert who testified, and there was no testimony as to Mr. Hardy being a gang member. However, that may be because his gang membership was out of Carson, which, although as the crow flies, it's not very far from Watts where this shooting took place, it's a different area, different gang cliques are involved there, not the bounty hunters, not the 118 Crips, which were involved in this case. It's not, although the overwhelming, overlying gangs, the Bloods and the Crips are opposed, that particular group was not involved in the conflict that was involved in this case. It's also a former gang membership, not a current gang membership, so it's of limited use. Here's a question that's not been argued in the briefs, but it struck me as I was reading through the record of this case, and I'm not sure what I'm supposed to do with it. In closing argument, the prosecutor makes a big thing of Amado was on the bus, that Pew was on the bus, and that somebody else was on the bus who was identified as having light skin. Amado had light skin, therefore we can assume that he was on the bus. And then he keeps talking about, well, here's this guy, Amado, who gets on the bus, but he's asking you to believe that he really wasn't very much involved in this. As I read the transcript, not just the argument, but the evidence of all of the witnesses, there was a light skin person on the bus, and that light skin person had braids, or maybe had a jerry curl. The uncontested evidence as to Amado was that he had his hair slicked back, possibly in a ponytail, and that whoever was on the bus with braids or perhaps jerry curl could not have been Amado. So the jury, and there's no objection to the evidence, no objection to the prosecutor's argument that, wait a minute, misstates the evidence, which it clearly did. I'm trying to figure out what am I supposed to do with the fact that the jury actually might have been influenced by argument as to facts that weren't really true, and then I'm trying to figure out, well, what's the proper way to analyze materiality if I take away at least some of the credibility of Mr. Hardy, and then I look at the evidence that was actually in front of the jury, what do I do with the fact that I've got a bad argument by the prosecutor as to some of that evidence? Do I just ignore that as I try to figure out what the consequence would have been had the evidence been admitted and used? This is a puzzlement for me. It struck me as not an argument, but I'm trying to figure out as to materiality. I go back and I read the record. Okay, so what's going to happen if this case is retried? Well, you have three witnesses who identified Amado as being involved. One of them being Hardy. One of them being Hardy. Grissom saw him go with a group of crips towards the bus. And then Barner, who was at some time Hugh's girlfriend, whatever that's worth, saw him behind the bus and saw him going to the bus with Bob, and Bob is Robert Johnson, who was the ultimate shooter in the case. So you do have three separate individuals, no connection between them, who will identify him as being involved in the team that went and attacked the bus. But as I look at what the prosecutor did, the testimony is a little bit There were somewhere between four and seven is the numbers that I read in the transcript. And the prosecution, I think I understand exactly why they did it. They only prosecuted three of them. They prosecuted Johnson, the trigger man. They prosecute Pew, who gets on the bus and is overheard planning with Johnson. And they prosecute Amado. There are one, maybe three or four more young men there, in addition to Pew, yet they focus only on Amado. Well, if you believe that he's the one that they can place with a gun and actively involved, and if they believe that he's laughing or bragging about it, I can see why they did that. But if he's only there, the prosecutor, as the other guys, I mean, the prosecutor didn't go after him. And I understand why the prosecutor didn't go after them also. So if the jury was told, well, the only evidence we have about Amado is he was with the group, I don't know that that's very strong evidence that would support a conviction of a guy for sending him away for 27 years to life who's, at the time of the crime, a 16-year-old. Well, I don't think you totally negate Mr. Hardy's testimony. You just undermined it to some degree. That's the issue, yeah. Yeah. And it was already undermined at trial. He looked straight at Mr. Amado in the courtroom, and it was very clearly pointed out as being the person in the courtroom with split back hair. And he said, I don't remember. I can't recall what he looks like. He doesn't identify him. And the jury clearly didn't believe the I don't remember part. I don't either. So what we have here is this collateral impeachment, which is more evidence that you shouldn't have an aura of veracity. That's the term that's used when these prior convictions come up. What's a collateral impeachment? An aura of veracity. Well, what is a collateral impeachment? What evidence? It's this impeachment evidence didn't directly contradict Mr. Hardy's testimony. A lot of the Brady cases, including Brady itself, the evidence that's being withheld is a statement. But the evidence that came in was not in isolation the I don't remember. It was the I don't remember plus the prior statement. And the impeachment would have affected the veracity of the prior statement. That's the contention. If the jury had known that Hardy was a robber and a member of another gang and might have a motive to finger this gang, get the police to help the Bloods get after the Crips, that's useful stuff for a defense counsel to argue, and maybe the jury would believe it. Well, absolutely. That is relevant material. That's why it's favorable evidence. It should have been handed over. But the question is, it's favorable. If it was suppressed, is it material? And my argument is that it's not material in this case because you had three eyewitnesses, Hardy being one of them who identified Amato as being part of this. And each of their statements corroborated Hardy's testimony. If Amato had just let's take away the gun. If he were just running to the scene, period, could he have been convicted? I certainly would acknowledge this to accomplish testimony where you need to have corroboration. It doesn't need to corroborate every single. But if he was just present at the scene, could he have been convicted? Absolutely. He was part of the team there to back up Mr. Johnson who had the gun, who had the deadly weapon. They didn't know how many bloods were on the bus, and he didn't just go by himself, Mr. Johnson. He went with a team, with a group who had his back and were protecting him. Was there anyone convicted in this melee who did not have a gun? Well, I don't believe Mr. Pugh had a gun. But the evidence against Mr. Pugh is that he's overheard by Briggs plotting they're going to get him. And the evidence against Mr. Pugh is unambiguous that he's on the bus getting Tyrone Power pointed out. And then Johnson shoots and misses, but shoots at Tyrone Power. So we've got lots of evidence from which the jury could conclude that Pugh is culpable. Yes. Yes. But the point is that the gun wasn't the pivotal issue in terms of holding people accountable for being part of the group. No, it was. Certainly. I mean, the gun was great evidence, and the prosecutor appropriately emphasized that in his closing argument. Right. The question here is whether the jury, having heard additional evidence about Hardy, would discount that testimony about the gun. And having had three witnesses of all identified modems being involved, that's sufficient to corroborate Hardy's testimony. But they don't corroborate as to the gun. Not every single element, no. Well, I'm speaking specifically of the gun. The other two do not corroborate as to the gun. That's correct. The only gun testimony comes from Hardy. That is correct. But your point is they corroborate him generally so that his testimony about the gun is more believable, and the impeachment evidence would not have destroyed it to the point where the jury would have made a different determination. That's the question. I think that's where we are. Okay. Any further questions? Thank you. Two minutes. Judge Pletcher, I think the statement by the Court of Appeals saying Hardy's declaration establishes what evidence would be available and its materiality shows that I think the Court of Appeals did rule on that, but I would love to have you do a de novo review if you don't think it's on that issue. The issue of guns alone is not the issue. The issue was evidence to show that you did intend or joined. There's plenty of evidence that Pugh and Johnson did this because they talked about it beforehand. Everybody knows that. The issue is what did Mr. Amato do to show that he was more than merely present, and going there with a gun is an act for him that's important. Whether or not Pugh had a gun, it was clear. So guns alone isn't enough, but the gun on Amato is. That's all I have to say. Thank you very much. Thank you. Well, a long morning, and thank you, both of you, for good arguments. Amato v. Gonzales now submitted for decision, and we're adjourned until tomorrow.
judges: Hellerstein, Fletcher, Rawlinson